IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BROOKLYNN C. CLARK, an individual,

               Plaintiff,

     v.

MARQUIS CLINICAL SERVICES, LLC;
MARQUIS COMPANIES I, INC.; MARQUIS
COMPANIES II, INC.; MARQUIS
COMPANIES; EMILY WALTON; KATY
ZAHRTE; MIA YEAGER; JUSTIN MACKEY;
and JANE/JOHN DOES 1-10,

               Defendants.

Case No. 3:23-cv-00404-JR

FINDINGS AND
RECOMMENDATION

_____

RUSSO, Magistrate Judge:

     Defendants Marquis Clinical Services, LLC, Marquis Companies I, Marquis Companies II, Marquis Companies (collectively "Marquis"), Emily Walton, Katy Zahrte, Mia Yeager, Justin Mackey, and Jane/John Does 1-10 move for summary judgment pursuant to Fed. R. Civ. P. 56 in regard to all of pro se plaintiff Brooklynn Clark's claims. For the reasons set forth below, defendants' motion should be granted, and this case dismissed.

Page 1 – FINDINGS AND RECOMMENDATION

## BACKGROUND

Marquis is "a long-term care management company that primarily runs assisted living facilities with post-hospital acute care and long-term care." Fogg Decl. ¶ 4 ([doc. 46](doc. 46)). In 2021, Marquis offered a free, "six-week long training course for student who wanted to acquire the knowledge and skills necessary to obtain certification as a Certified Nursing Assistant through the Oregon State Board of Nursing" ("OSBN"). *Id.* at ¶ 9; Fogg Decl. Ex. 1, at 1 ([doc. 46](doc. 46)). The training program ("CNA Program") was comprised of two components – a classroom portion that consisted of a minimum of 80 hours of instruction and a clinical portion that required the student to complete 75 hours "working in a nursing facility with residents, providing care according to the resident's individual care plan." Fogg Decl. Ex. 1, at 1 ([doc. 46](doc. 46)). At that time, Marquis' COVID-19 policies "allowed [students] to wear their own standard mask or an N95" during the classroom portion, but if the student was "going to the resident care area [they] were issued . . . an N95 mask that [they] were required to wear." Fogg Dep. 16:1-16:23 ([doc. 46](doc. 46)).

The "Attendance Requirements" for the CNA Program contained a code of conduct that specified:

> All students must accept certain responsibilities; adhere to acceptable practices in matter of conduct/behavior, and exhibit a high degree of personal integrity at all times . . . Conduct that interferes with safety of the facility, brings discredit to the program/facility/clients or staff, or any act that is offensive to a client, family member, visitor or employee, will not be condoned [and may be grounds for dismissal]. Examples include, but are not limited to: Failure to treat clients, visitor[s], staff, instructors and fellow students with kindness, respect and dignity[;] [n]ot being courteous or helpful[;] [n]ot following safety precautions[;] [and] [n]ot following instructions of instructor/supervisor.

Fogg Decl. Ex. 5, at 1 ([doc. 46](doc. 46)). The "Cancellation and Refund Policy" also required "student[s] in the [CNA Program to act] in a professional manner (follow instructions, take constructive

criticism, use appropriate language, stay calm and collected in stressful situations, etc.)." Balasubramani Decl. Ex. 8, at 1 (doc. 46).

On January 18, 2021, plaintiff received an "Offer of Placement" to participate as "a student" in the CNA Program at Marquis' Tualatin, Oregon, facility. Balasubramani Decl. Ex. 2, at 1 (doc. 46). On January 27, 2021, plaintiff started the classroom portion of the program. *Id.* As part of that process, plaintiff signed a form acknowledging that she had received and read the "Attendance Requirements" and "Cancellation and Refund Policy." Balasubramani Decl. Ex. 3, at 1 (doc. 46).

On February 5, 2021, Mackey, an instructor, raised an inquiry with Walton, Marquis' Education Program Administrator, about personal protective equipment ("PPE") in the classroom. Balasubramani Decl. Ex. 6, at 1 (doc. 46); Fogg Decl. Ex. 18, at 1 (doc. 46). In response, Walton sent the following email to plaintiff:

> My name is Emily Walton . . . I help oversee and manage the [CNA Program.] It has been brought to my attention that you have been wearing an additional cloth mask over the medical mask that is given to you. The medical masks that we supply are the woven multiple layer masks that the [Centers for Disease Control and Prevention ("CDC")] recommends for employees in nursing homes to wear.
>
> The Oregon Health Authority [("OHA")] has directed not to have secondary masks on top of medical grade masks. The reason for this being that adding an additional mask creates more touch points and actually increases risk for infection. We ask that you discontinue the use of your cloth mask effective immediately to help alleviate the possible increase of infection risks.
>
> If you have any additional questions or concerns, please reach out to me directly.

Balasubramani Decl. Ex. 6, at 1 (doc. 46).

Plaintiff responded: "I choose to follow the most up-to-date instructions provided by Dr. Fauci, the CDC, and the [World Health Organization]! Further, I choose to protect my body in the way that is best for me . . . The evidence is clear and I will continue to wear two (2) masks." *Id.*

Plaintiff included a link to a CNBC article and also noted that "other students in this class wore double masks everyday except today and thus Mr. Mackey 'all of the sudden' decided to target me with negativity . . . bias may be a factor." *Id.*

> On February 6, 2021, Walton replied:
>
> As stated in the article you provided, the CDC has not recommended double masking at this time. We are required to follow CDC and OHA guidelines, not take source statements from news media . . . The medical mask that you are provided when you enter the building is what the CDC and OHA is currently recommending. I value your decision to protect your body and to do it in a way that is best for you. With this being said, we have PPE standards that we are required to abide by. Long-term care is highly regulated by state officials, at this time the PPE protocol and directions we have in place is there to protect a very fragile population of people. The cloth mask that you are utilizing has large potential to bring infection into the building and potentially initiate a spread of COVID-19 . . . If you feel that you must wear two masks – please wear two medical masks – not a cloth mask.

*Id.* at 2. Walton also confirmed that plaintiff was allowed to purchase N95 masks "independently and wear them to class." *Id.* at 2-3; Balasubramani Decl. Ex. 7, at 1-2 (doc. 46).

Walton then sent a communication to all students to address the topic of cloth masks, detailing that the CDC and OHA did not recommend double masking or placing a cloth mask over a surgical mask "at this time," and instructing students that they must follow PPE requirements to participate in the CNA Program. Balasubramani Decl. Ex. 6, at 2 (doc. 46); Fogg Decl. Ex. 18, at 1 (doc. 46). Plaintiff apparently wore personally furnished N95 masks without incident for the remainer of the classroom portion, which ended on February 19, 2021.

On February 23, 2021, plaintiff presented for her first day of clinical rotations. A conflict ensued between plaintiff and Yeager, an instructor, surrounding plaintiff's attempt to use her own N95 mask (as opposed to the one provided by Marquis) in the resident area. In particular, Yeager "noticed [that plaintiff] was wearing a black N95 mask she brought from home . . . and explained that we wear the blue disposable masks after we hand sanitize and then proceed to the check-in

desk." Balasubramani Decl. Ex. 14, at 1 (doc. 46). Plaintiff "told [Yeager] that she had email proof from Emily Walton that she was allowed to wear her own, brand new N95 masks." *Id.* Yeager "wanted to continue to explain the procedure of how we walk around the building and have bags set aside containing our in-house N95 masks," but was having a difficult time communicating effectively with plaintiff. *Id.* The housekeeping manager, Bob Seashore, walked over and tried to intervene. *Id.*; Balasubramani Decl. Ex. 16, at 1 (doc. 46). Yeager eventually "asked [plaintiff] to leave." *Id.*

> At 6:45 a.m., plaintiff sent the following email to Walton:

> This morning at about 5:45am, Ms. Yeager . . . began questioning me and demanding that I remove and replace my brand new N95 mask for a single surgical mask. I advised Ms. Yeager that I had already received approval from you . . . to purchase and wear my own N95 masks as your company would be unwilling/unable to provide them to me . . . an unidentified make also began demanding that I replace my mask because it was/is your 'policy' and I reiterated that this/these issues had already been resolved within the company and I was willing to provide proof of the same. He said 'it didn't matter because it was their policy.' Next he offered to provide an N95 mask to me and I agreed but that mask never appeared nor was it physically presented to me; only verbally . . . I did feel like I was being attacked as it had now become a disagreement between my instructor, myself and another person. Two people against one me, for wearing an N95 mask.

> Finally Ms. Yeager told me to leave the building because I 'challenged' them. I'm not quite sure what she meant by that; but that's what she said. I don't believe I 'challenged' them; but I did try to explain that the mask controversy had already been resolved.

> I'd like to complete this CNA course as I have done all the work and received high marks/grades. All I need now is the opportunity to prove my ability without harassment and/or interference when it comes to wearing surgical and/or N95 masks . . . Please advise.

Balasubramani Decl. Ex. 6, at 3 (doc. 46). Walton responded immediately that she would "speak with my team and staff members at our Tualatin building [and] loop back around with you before the end of business today." *Id.* Walton reached out again that evening to communicate "we will continue to have you paused for the clinical rotation" because there "had not [been] enough time"

to conclude the investigation but "additional interviews [will take place] tomorrow with staff members that were present." *Id.* at 4. Plaintiff claimed that banning her "from class is harming/punishing me for taking covid-19 seriously" and that she "committed no offense other than wearing my N95 as you advised was/is permissible." *Id.*

On February 24, 2021, Walton sent plaintiff a follow-up email surrounding the incident:

I have had some time to speak with staff members and now fully understand where the miscommunication happened Tuesday.[1] I want to be clear that in no capacity were you being targeted or harassed. All the students in your clinical group were asked to complete the same PPE protocol steps as you. You are able to wear your own N95 mask in the lobby of the ALF while completing COVID screening. You are NOT allowed to wear your personal N95 mask once you enter the PAR [at which point] you are required to wear a facility issued N95 mask.

You are correct in your statement; I did give you approval to wear your own N95 masks in the classroom setting. I should have been clearer with my communication, the approval of independently bought N95 masks was to be given specifically for the classroom setting. When transitioning from the classroom to the clinical setting there are PPE requirements that change. For example, while in the classroom it was not required to wear an N95, only required to wear a surgical mask. Now that you will be conducting resident care, we do require that you wear a facility issued N95 mask.

The "unidentified male" that you refence in your email is the Maintenance/Housekeeping Director. He intervened in the situation due to feeling like the conversation between you and [Yeager] was not positive or appropriate to be had in a public setting. He was attempting to communicate to you that you would receive a new N95 mask prior to entry into the PAR.

While working in a clinical setting, it is our goal to meet the infection control standards that are put in place by the [OHA]. To make sure that we are protecting residents, Tualatin has put in place the below PPE protocol.

---

[1] The witness statements that Walton collected from both students and staff generally describe plaintiff as "rude," "disrespectful," and "constantly interrupting" during the incident. Balasubramani Decl. Exs. 13-16 (doc. 46). And plaintiff subsequently acknowledged at her deposition that she did not "follow the instruction of a supervisor or instructor" in accordance with the code of conduct. Clark Dep. 106:8-106:19 (doc. 46). However, the student witnesses also indicated Yeager "snapped" at plaintiff and "should have moved the conversation into a private place," and that Seashore was "too stern." Balasubramani Decl. Ex. 13, at 1 (doc. 46).

**Tualatin PPE Protocol**
1. Enter Tualatin ALF.
2. Sanitize Hands.
3. Participate in COVID screening questions/temporal temperature taken.
4. Walk outside of the Tualatin ALF, walk down the sidewalk, enter through the side door of Tualatin PAR.
    a. We request that you walk outside the building to alleviate potential spread of infection.
5. Once you enter the PAR, you are asked to remove your mask (regardless if it is an N95) and asked to wear a facility issued mask.
    a. N95 masks are provided to you upon entrance.
    b. You will have a designated area that will hold masks for you while on the floor.
    c. You will be given a new N95 mask for every day of the week. Mask bags will be dated and initialed.
    d. You will also be provided a face shield.

The personal behavior and conduct concerns that resulted from this situation on Tuesday morning need to be addressed. The instructor and Maintenance Direction both conveyed that your communication was argumentative, dismissive and disrespectful. Upon entering the course, you signed an enrollment agreement. This document detailed that you would adhere to acceptable practice in matter of conduct/behavior and always exhibit a high degree of personal integrity. The policy was violated on Tuesday morning [which] will result in a written warning. The written warning that I have attached will serve as your final written warning. If there is additional behavior concerns that arise during your time in the course, you will be dismissed from the program.

Please communicate any questions you have related to the information that is outlined above. Please acknowledge the receipt of this information by communicating that you will be able to follow this protocol.

*Id.*

Plaintiff responded with three separate emails, threatening legal action and alleging that she "was targeted, mistreated [and punished] for [a] discriminatory purpose" and "verbally assaulted" by two Marquis employees. *Id.* at 5. Plaintiff inquired whether Yeager was being "written up for this" and why she was not being given "a verbal warning . . . even though this is my 1st alleged offence?" *Id.*

Walton reassured plaintiff that she was not "being targeted or harassed as a result of being asked to follow our PPE protocols; we are asking you to follow the same policies, procedures and protocols that are expected from every student in the program . . . Our goal is to help each student, including yourself, successfully graduate from the course." *Id.* Walton nonetheless made clear that plaintiff needed to follow the PPE requirements for the clinical portion and reiterated the PPE protocol for the Tualatin residential facility. *Id.* She then asked plaintiff to confirm she was willing to follow that protocol and, additionally, that she was "able to adhere to the student conduct and behavior policies." *Id.* Finally, Walton provided plaintiff with information about how to file a complaint with the OSBN and complete the clinical portion with a different instructor (per plaintiff's request). *Id.*

Plaintiff accused Walton of "engaging in a cover up" and treating her differently than her "white classmates," and again threatened legal action. *Id.*

Thereafter, Walton, Zahrte, and plaintiff spoke over the phone which resulted in Walton's February 26, 2021, email commemorating the conversation. Balasubramani Decl. Ex. 19, at 1 (doc. 46); Fogg Decl. Ex. 18, at 1 (doc. 46). That email reflected that a resolution had been achieved in so far as plaintiff "verbally agreed to the PPE protocols in place." Balasubramani Decl. Ex. 19, at 1 (doc. 46). Walton reminded plaintiff that she was "permitted to return to a clinical rotation at this time if we can receive confirmation that you are [also] willing to adhere to our program policies and procedures" surrounding conduct, and were "happy to make accommodations regarding your request to participate in a clinical rotation with a different instructor . . . and will facilitate additional makeup time if you wish to remain with your original cohort of students." *Id.* at 1-2.

Plaintiff responded by "renew[ing] [her] complaints of systemic racism and or transphobia at Marquis" and also questioning whether Walton ever considered that she was a "disabled veteran" as disclosed on her initial application to the CNA Program. Balasubramani Decl. Ex. 21, at 5-6 (doc. 46). Plaintiff concluded her email by stating: "Blaming a transgender minority for the hostile actions and misinformation of a white cis-gender instructor and her white cis-gender boss is lame." *Id.*

On March 2, 2021, Walton sought to address plaintiff's statements. First, she reminded plaintiff that it is "my goal to help achieve a resolution and see you successfully complete this course . . . The clinical portion can be resumed at a different location with a different instructor if that is your preference." *Id.* at 4. Second, Walton indicated she was not aware plaintiff was disabled, transgender, a veteran, or a minority, denoting that the information plaintiff disclosed on her application was for "EEO reporting purposes only." *Id.* Third, Walton reported that allegations of discrimination are taken "very seriously" and that an "additional internal investigation" would be launched. *Id.* To that end, she asked plaintiff for information about her disability and how it was relevant to the situation, and also for a description of the "event(s) [that] have occurred that were a result of racism and/or transphobia." *Id.* Fourth, Walton remarked: "The corrective action was issued due to the nature of the behavior that was exhibited," explaining that the fact a "misunderstanding" surrounding the PPE protocol for clinical rotations caused plaintiff frustration "does not negate the need for communication to remain professional and respectful." *Id.*

On March 8, 2021, plaintiff replied that she "would like to complete the CNA course" and "will communicate with you if and/or when [ready] but at this time, I would ask for you/your company to stop sending my 'bad faith' communication made to appear friendly." *Id.* at 3. She also disclosed that she has "extreme anxiety which causes panic attacks," and doubled down on

her claims that Yeager "targeted" and "verbal[ly] assaulted" her "simply [for] wearing an N95 mask in an assisted living facility and in the middle of a global pandemic." *Id.*

On March 22, 2021, plaintiff reached out to Walton expressing a "read[iness] to move forward and complete the CNA course." *Id.* Walton provided plaintiff with the schedules and locations for a number of upcoming clinical rotations, and reminded plaintiff that, per OSBN rules, she was required to complete the CNA Program prior to June 19, 2021. *Id.* at 2-3.

On March 26, 2021, plaintiff and Walton spoke again over the phone, at which time plaintiff disclosed that she was only available for very limited (i.e., 2 to 6 hour) windows on Wednesdays, Thursdays, and Fridays. *Id.* at 1-2. Walton stated Marquis could "not [currently] accommodate the specific schedule needs that you have," noting "that clinical hours are completed in a successional pattern" and "[p]articipating in clinicals for a few hours a week would be a disservice to you, your education, disruptive to the residents we serve, and furthermore is not supported by the current curriculum and schedule format that has been approved by the OSBN." *Id.* at 2. Walton invited plaintiff to rejoin clinical rotations when her schedule allowed.

Plaintiff was apparently dissatisfied with this response, stating Marquis was at fault for her inability to complete the CNA Program – specifically, "[y]our over zealous and bigoted teacher [who] removed [me] for wearing an N95 mask" – and that "[c]omplaints will be filed." *Id.* at 1.

On March 20, 2023, plaintiff initiated this action pro se. On August 3, 2023, plaintiff filed the dispositive complaint alleging: (1) sex/gender/race discrimination in violation of Title VII and Or. Rev. Stat. § 659A.030; (2) race discrimination in violation of 42 U.S.C. § 1981; and (3) disability discrimination in violation of Section 504 of the Rehabilitation Act and the Americans with Disabilities Act ("ADA"). *See generally* Second Am. Compl. (doc. 22). Pro bono representation was subsequently appointed and accepted, and discovery was conducted with the

assistance of counsel. However, on September 13, 2024, plaintiff terminated counsel's services. Cambreleng ¶ 4 (doc. 44).

On September 30, 2024, defendants filed the present motion for summary judgment. Briefing was completed in regard to that motion on November 13, 2024.

## STANDARD OF REVIEW

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. T.W. Elec. Servs., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. Id. at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. T.W. Elec., 809 F.2d at 630.

## DISCUSSION

Defendants argue summary judgment is warranted on plaintiff's Title VII and state law claims "because [she] was never an employee of Marquis." Defs.' Mot. Summ. J. 12 (doc. 46).

Defendants also contend that plaintiff's § 1981 claim fails as "there is no direct evidence of racial discrimination" and, in any event, they "can articulate a legitimate, non-discriminatory reason for any adverse action" and there is no evidence of pretext. *Id.* at 16, 20. Lastly, defendants maintain that plaintiff's ADA and Rehabilitation Act claims must be dismissed "because it is indisputable that Marquis's duty to accommodate was never triggered" – that is, "[a]t no point in any of the communications with defendant Walton did plaintiff ever make a request for an accommodation or otherwise initiate the interactive process." *Id.* at 23.

Plaintiff does not meaningfully address a number of defendants' arguments, nor does she provide any additional evidence. *See* Pl.'s Resp. Mot. Summ. J. 9 (doc. 54) (plaintiff "is comfortable relying upon the exhibits/email evidence produced by the Defendants"). Instead, plaintiff broadly opposes summary judgment, largely by posing questions or making conclusions surrounding conversations or events that might have occurred or are otherwise not documented in the record. *See id.* at 2-4 ("it is highly probable/likely that this topic (plaintiff's gender) was discussed via a telephone call or via in-person conversation [so either] Walton and Mackey had an undocumented conversation [or the evidence relating to] Mackey's question/concern regarding double-masks [has] been omitted from this Court's record. The question remains, what was communicated between Defendants Walter, Mackey, and Yeager regarding the fake controversy over PPE? . . . [I]t is obvious to any lay person that Mackey and Yeager do/did not care for/like the Plaintiff very much, but why: Race, Gender, Orientation, Disability Status, and/or something else?) (internal quotations and emphasis omitted).

As an initial matter, plaintiff's broad assertions about the tone and content of the record, or references to potential conversations or pieces of evidence that are not currently before the Court, are inadequate to create a disputed issue of material fact. *Cf. Carrillo-Gonzalez v. Immigr. &.*

*Naturalization Serv.*, 353 F.3d 1077, 1079 (9th Cir. 2003) (allegations and arguments do "not constitute evidence"); *FTC v. Publ'g Clearinghouse, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) (conclusory, self-serving statements in a brief or declaration that are unsupported by facts or evidence do not create genuine issues for trial); *see also* Bogner v. R & B Sys., Inc., 2011 WL 1832750, *3 (E.D. Wash. May 12, 2011) (court "is not bound by [an individual's] legal conclusions"; disputed issues of material fact can "not [be] created by simply averring that an act 'was [a legal violation or]' declaring that one's versions of events is 'consistent' with one's theory of the case").

Because plaintiff must, at this stage in the proceedings, go "beyond the pleadings" and cite "specific facts" that show "there is a genuine issue for trial," this deficiency is fatal to her claims. *See Celotex*, 477 U.S. at 322-24 (summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden on proof at trial"); *see also Anderson*, 477 U.S. at 252 (in order to defeat a motion for summary judgment "there must be evidence on which the jury could reasonably find for the [non-moving party]"); *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1116 (9th Cir. 2003) ("conclusory allegations, unsupported by facts, are insufficient to survive a motion for summary judgment"). As discussed below, the Court nonetheless finds that defendants' actions do not give rise to liability.

## I.    Title VII/Or. Rev. Stat. § 659A.030 Claims

Title VII and Or. Rev. Stat. § 659A.030(1)(a) make it unlawful for an employer to discriminate against an individual in the terms and conditions of employment because of sex/gender or race. "Claims brought under [Oregon law] are analyzed under the same framework

as claims brought under Title VII." *El v. United Parcel Serv., Inc.*, 2020 WL 2616397, *3 (D. Or. May 22, 2020).

Although Title VII is generally construed broadly, it only "imposes liability for discrimination on 'employers.'" *U.S. Equal Emp. Opportunity Comm'n v. Global Horizons, Inc.*, 915 F.3d 631, 633, 637 (9th Cir. 2019) (quoting 42 U.S.C. § 2000e-2(a)); *see also Lutcher v. Musicians Union Loc. 47*, 633 F.2d 880, 883 (9th Cir. 1980) ("there must be some connection with an employment relationship for Title VII protections to apply"). "[T]o qualify as an employee under Title VII, [the plaintiff] must (1) receive substantial benefits from the alleged employment, and (2) satisfy the common law agency test reflecting a sufficient degree of control by the alleged employer over the alleged employee." *Gimby v. Or. Health & Sci. Univ. Sch. of Nursing* ("*Gimby II*"), 2024 WL 3027858, *2 (D. Or. June 14, 2024).

Concerning the former element, a salary or "non-salary benefits such as retirement, insurance, or annual leave may" are sufficient. *Gimby v. Or. Health & Sci. Univ. Sch. of Nursing* ("*Gimby I*"), 2024 WL 728750, *2 (D. Or. Feb. 19, 2024); *see also Waisgerber v. City of L.A.*, 406 Fed.Appx. 150, 152 (9th Cir. 2010) ("remuneration need not be a salary, but must consist of substantial benefits not merely incidental to the activity performed") (citation and internal quotations and brackets omitted).

Regarding the latter element, "the principal guidepost is the element of control – that is, the extent of control that one may exercise over the details of the work of the other." *Global Horizons*, 915 F.3d at 638 (citations and internal quotations omitted). The court considers the following "non-exhaustive list of factors . . . when analyzing whether the requisite control exists":

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the

hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* (citation and internal quotations omitted).

There is no evidence in the record before the Court that plaintiff received compensation, insurance, annual leave, or any other salary or non-salary benefits in the course of participating in the CNA Program. In fact, plaintiff admitted that defendants did not "pay [her] for [her] services or . . . time." Clark Dep. 45:22-46:1 (doc. 46). The only purported benefit she identifies in the record is the nursing assistant training itself. *See id.* at 46:15-46:1 ("[t]hey're paying me by teaching me"); *see also* Pl.'s Resp. to Mot. Summ. J. 8 (doc. 54) (plaintiff "was at least considered for employment, if not already employed by Marquis, since: 1. Marquis conducted an interview to assess plaintiff's viability as an employee; 2. Accepted [her] into the [CNA Program] free of charge; 3. [Many] students go on to become employed with Marquis; 4. [The CNA Program's primary purpose] is to access a direct pipeline of CNAs needed to operate Marquis' facilities; 5. Staff [advised] students (correctly or incorrectly) that [they] were expected to work for Marquis for at least 6 months after complet[ion]; 6. Clinical hours = volunteer work needed to gain required hours for state licensure/certification") (internal quotations and emphasis omitted).

Yet, as plaintiff recognizes, that training alone did not qualify nursing assistant students to work; rather, their certification was regulated by the OSBN and employment with Marquis upon successful completion of the CNA Program was not guaranteed. *See, e.g.*, Walton Dep. 10:18-11:11 (doc. 46); *see also id.* at 19:11-20:7 (Marquis CNA students are not given preference over other candidates for open positions upon completion of the program).

Given the undisputed record, summary judgment as to plaintiff's Title VII and state law claims is appropriate. *See Waisgerber*, 406 Fed.Appx. at 152 ("unpaid volunteer researcher was

not an employee under Title VII because she did not receive annual or sick leave, retirement benefits, or insurance benefits") (citation omitted); *Gimby II*, 2024 WL 3027858 at *2-4 (noting that the plaintiff's "status as a [nursing] student does not on its own give rise to a claim under Title VII" and dismissing her discrimination claim with prejudice where the defendant "was not paying [her] a wage at the time her exemption was denied" and she otherwise did "not allege that she received any other substantial benefit besides wages"); *see also Lutcher*, 633 F.2d at 882-84 (granting summary judgment in favor of the defendant in regard to the plaintiff's Title VII claim where there was no evidence of an employment relationship).

Even assuming the existence of a substantial benefit, plaintiff neglected to introduce any evidence establishing that she was defendants' employee under the common law agency test (her response brief is completely silent as to this issue). Nevertheless, plaintiff did not perform any work for defendants while in the classroom, nor was plaintiff's participation in the classroom portion of the CNA Program necessarily for defendants' benefit. And, although plaintiff did not complete the clinical portion of the program, her claim cannot succeed on that basis either. *Cf. Gimby I*, 2024 WL 728750 at *3 (rejecting the plaintiff's contention "that her pleadings establish agency because . . . she was in clinical rotations with direct contact with patients while wearing full personal protective equipment and testing weekly for COVID-19") (citation and internal quotations omitted). Defendants' motion is granted in this regard.[2]

---

[2] The Court also notes that plaintiff does not contest defendants' assertion that "she failed to exhaust her administrative remedies." Defs.' Mot. Summ. J. 15 (doc. 46); *see also Justice v. Rockwell Collins, Inc.*, 117 F.Supp.3d 1119, 1134 (D. Or. 2015), *aff'd*, 720 Fed.Appx. 365 (9th Cir. 2017) ("if a party fails to counter an argument that the opposing party makes ... the court may treat that argument as conceded") (citation and internal quotations and brackets omitted). If an employment relationship did exist, plaintiff would be required to first file an administrative charge with either the Equal Employment Opportunity Commission or the Oregon Bureau of Labor and Industries within 300 days of the alleged unlawful employment practice in order to maintain a

II.    **42 U.S.C. § 1981** Claim

To prevail on a claim under 42 U.S.C. § 1981, the plaintiff must first present a prima facie case of race discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). To meet this requirement, the plaintiff must show she: (1) is a member of a protected class; (2) attempted to contract for certain services; (3) was denied the right to contract for those services; and (4) was deprived of contractual services while similarly situated persons outside her protected class were not and/or she received services in a markedly hostile manner which a reasonable person would find objectively discriminatory. *Jefferson v. City of Fremont*, 73 F.Supp.3d 1133, 1147 (N.D. Cal. 2014). Courts have therefore construed § 1981 claims to require proof of intentional discrimination. *See, e.g.*, *Menchu v. Legacy Health*, 2014 WL 2855042, *4 (D. Or. June 23, 2014).

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to prove it had a "legitimate non-discriminatory reason for the adverse action." *McDonnell Douglas*, 411 U.S. at 802. The plaintiff may then rebut this by showing the allegedly legitimate reason was "merely pretext." *Id.* at 804. To establish pretext, the plaintiff can "directly [demonstrate] that unlawful discrimination more likely than not motivated" the defendant or "indirectly [demonstrate] that the [defendant's] proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable." *France v. Johnson*, 795 F.3d 1170, 1175 (9th Cir. 2015).

In this case, there is no dispute that plaintiff was never dismissed from the CNA Program. On the contrary, it is uncontroverted that defendants provided plaintiff with several opportunities

---

Title VII claim. *See, e.g.*, *Pearson v. Reynolds Sch. Dist. #7*, 998 F.Supp.2d 1004, 1019 (D. Or. 2014).

to rejoin clinical rotations within the OSBN's timing requirements. In light of these facts, plaintiff's reliance on her own conclusory statements of discrimination are unpersuasive. *See Mikes v. Albertsons Cos., LLC*, 2019 WL 2251821, *2 (D. Or. Apr. 10), *adopted by* 2019 WL 2250579 (D. Or. May 24, 2019) (granting summary judgment in favor of the defendant where the plaintiff "rest[ed] her claim exclusively on [a statement in her affidavit that] her Black race was the principal factor in causing" the allegedly discriminatory conduct) (citation and internal quotations omitted); *Ofuasia v. Spirit Halloween Superstores, LLC*, 2021 WL 3783069, *4 (D. Or. July 21, 2021), *adopted by* 2021 WL 3779834 (D. Or. Aug. 24, 2021), *aff'd*, 2022 WL 15523098 (9th Cir. Oct. 27, 2022) (where the defendants' actions were "race-neutral," a plaintiff's statement, even under penalty of perjury, that those actions were "based on [her] race . . . cannot give rise to an inference of discriminatory intent"); *see also Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1419 (9th Cir. 1988) ("conclusory allegations of discrimination are insufficient to satisfy the requirements of Rule 56" and "[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion") (citation and internal quotations omitted).[3]

Because plaintiff neglected to identify facts surrounding the fourth prima facie element showing a genuine dispute, a reasonable juror could not conclude defendants' actions were

---

[3] Given plaintiff's acknowledgment at her deposition that she did not "follow the instruction of a supervisor or instructor" in accordance with the code of conduct, a reasonable jury could not infer that Walton or Zahrte were motivated to discipline plaintiff because of her race. Clark Dep. 106:8-106:19 (doc. 46). This is especially true considering there is no evidence Walton or Zahrte knew plaintiff's race (or, for that matter, her gender or disability) prior to the corrective action being issued, or that the PPE protocols and/or code of conduct were not similarly enforced in regard to other students. For this reason, plaintiff's discrimination claims fail at summary judgment irrespective of whether they proceed under Title VII, 42 U.S.C. § 1981, the ADA, the Rehabilitation Act, or Title IX (which applies to educational settings). *See, e.g., Robinson v. Univ. of Wash.*, 2016 WL 4218399, *5-7 (W.D. Wash. Aug. 9, 2016), *aff'd*, 691 Fed.Appx. 882 (9th Cir. 2017); *Ofuasia*, 2021 WL 3783069 at *4-8.

objectively discriminatory. Furthermore, plaintiff provides no support for her assertion that defendants treated persons outside her protected class differently. *Cf. Jefferson*, 73 F.Supp.3d at 1147 (the plaintiff's failure to provide evidence of disparate impact "negated any claim of intentional discrimination"). Defendants' motion is granted as to plaintiff's § 1981 claim.

III.    **ADA/Rehabilitation Act Claims**

To demonstrate a prima facie case in this context, the plaintiff must show "(1) she is disabled under the Act; (2) she is otherwise qualified to remain a student at the [training program], i.e., she can meet the essential eligibility requirements of the school, with or without reasonable accommodation; (3) she was dismissed solely because of her disability; and (4) the [training program] receives federal financial assistance (for the Rehabilitation Act claim), or is a public entity (for the ADA claim)." *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1045 (9th Cir. 1999).

An entity's duty to engage in the interactive process generally arises with a request for accommodation. *See, e.g.*, *Brown v. Lucky Stores, Inc.*, 246 F.3d 1182, 1188 (9th Cir. 2001), *overruled in part on other grounds by Marx v. Gen. Revenue Corp.*, 568 U.S. 371 (2013); *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002). While the plaintiff is "not require[d] to speak any magic words" to request accommodation, they still must affirmatively indicate the existence of an impairment and need for assistance. *Schmidt v. Safeway Inc.*, 864 F.Supp. 991, 997 (D. Or. 1994). This is because the plaintiff "can't expect the [entity] to read his mind and know he secretly wanted a particular accommodation and sue . . . for not providing it." *Id.* Regardless, if the entity "otherwise becomes aware of the condition, such as through a third party or by observation," it has a duty to accommodate. *Id.*

Here, there is no evidence that plaintiff either informed defendants that she suffered from anxiety/panic attacks or was struggling to complete the CNA Program as a result thereof prior to

the corrective action being issued.[4] Even accepting plaintiff's unsupported assertion that "[d]efendants were aware of [her] race and disability status" because they were disclosed on her application, the Court notes that an entity's initial willingness to admit an individual to an educational program is strong evidence the entity is not biased against that protected class. Pl.'s Resp. to Mot. Summ. J. 2 (doc. 54); *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270-71 (9th Cir. 1996)**;** *see also Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1096 (9th Cir. 2005) (where "the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a relatively short period of time, a strong inference arises that there was no discriminatory action") (citation and internal quotations omitted).

Yet the "same-actor rule" is "not necessarily dispositive" in this case precisely because the Marquis employees responsible for making admission decisions differ from those responsible for managing the CNA Program. *Robinson*, 2016 WL 4218399 at \*5; *see also Schmidt*, 864 F.Supp. at 997 (an entity cannot be "liable for failing to accommodate a disability of which it had no knowledge"); *Davis v. Safeway, Inc.*, 1996 WL 266128, \*3-5 (N.D. Cal. May 14, 1996) (granting

---

[4] Plaintiff's contention that defendants "could and/or should" have been aware of her mental health conditions because "Mackey and Yeager were licensed and trained Registered Nurses" (and Walton "might also be a current or former nurse") is unavailing. Pl.'s Resp. to Mot. Summ. J. 4 (doc. 54). There is no evidence that plaintiff was exhibiting the signs and symptoms of anxiety – as opposed to general stress and worry about the pandemic (which is something many people were experiencing at the time) – during her interaction with Yeager and Seashore, or that defendants otherwise obtained information from a third-party suggesting that plaintiff's impairments would impact her performance or require accommodation. And, contrary to plaintiff's assertion, Walton's approval of the use of self-purchased N95 masks during the classroom portion of the CNA Program does not "constitute a medically necessary reasonable accommodation" in relation to the PPE protocols that apply in the clinical setting, especially given the dearth of medical evidence. *Id.* at 5; *see also* Defs.' Reply to Mot. Summ. J. 5-6 (doc. 57) ("[t]he application is not only not part of the summary judgment record, but . . . no reasonable jury could conclude that her disclosing she was 'disabled' without any additional information about the nature of the disability in any way triggered Marquis's obligation to engage in the interactive process," and "there is no evidence plaintiff ever mentioned that her desire to wear the mask of her choosing was due to her disability").

summary judgment in favor of the defendant where it was "undisputed that, prior to [the date of termination], plaintiff never informed defendant [of his disabling condition] and never requested any accommodation for [that condition]"). Defendants' motion is granted as to plaintiff's ADA/Rehabilitation Act claims.

## RECOMMENDATION

For the foregoing reasons, defendants' motion for summary judgment (doc. 46) should be granted and judgment should be prepared dismissing this case. Defendants' request for oral argument is denied as unnecessary.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. The parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the court. Thereafter, the parties shall have fourteen (14) days within which to file a response to the objections. Failure to timely file objections to any factual determination of the Magistrate Judge will be considered as a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to this recommendation.

DATED this 16th day of December, 2024.


_____
/s/ Jolie A. Russo
Jolie A. Russo
United States Magistrate Judge